UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>    Plaintiff,<br><br>       -against-<br><br>WILLIAM DAVID BROWN<br><br>    Defendant. | Civil Action: 2:24-cv-9571<br><br><br>**COMPLAINT** |

Plaintiff, Laboratory Corporation of America Holdings ("Labcorp"), by and through its undersigned attorneys, Kelley, Drye & Warren, LLP, states for its Complaint as follows:

## **NATURE OF THE ACTION**

1.      As part of its recent purchase of certain assets of BioReference Health LLC (formerly known as BioReference Laboratories, Inc.) ("BioReference"), Labcorp acquired and was assigned BioReference's rights under a Key Employee Agreement (the "Agreement"), dated March 11, 2020, that BioReference entered into with its now former employee, Defendant William David Brown ("Brown").

2.      Labcorp brings this action for injunctive relief, damages, costs and attorneys' fees for breach of contract and misappropriation of trade secrets arising from Brown's (i) theft of confidential, proprietary and trade secret information relating to the BioReference business that Labcorp acquired, (ii) breach of his

1

covenant not to compete in the same counties for which he provided services for BioReference for one year after his resignation, (iii) breach of his covenant not to solicit BioReference customers or prospective customers for one year after his resignation.

3.     The Agreement contains common and enforceable post-employment restrictive covenants which expressly prohibit Brown, for a period of one year following the termination of his employment from: (i) commencing employment with a competitor within any county in which Brown provided services for BioReference during his employment, or (ii) soliciting any customers or prospective customers of BioReference. The Agreement further restricts Brown from using or disclosing any Confidential Information (as defined by the Agreement) and from taking any BioReference property with him upon his termination from BioReference.

4.     Brown voluntarily terminated his employment with BioReference effective August 2, 2024, and in breach of the Agreement, immediately began working for a direct competitor, Arbor Diagnostics, Inc. ("Arbor"), selling similar products to BioReference's products in the same territory to which he provided services for BioReference.

5.      Arbor is aware of Brown's Agreement, but nevertheless, stated that it will allow Brown to resume his employment with Arbor in violation of the Agreement starting on October 9, 2024.

6.      Prior to his resignation, Brown sent documents containing proprietary, confidential and/or trade secret information from his BioReference work email to his personal email account without authorization from BioReference, so that, upon information and belief, he could use the information to assist him in his employment with Arbor.

7.      An injunction against any continuation of the prohibited activities is necessary to prevent further harm to Labcorp caused by Brown's unfair and illegal activity which, if it continues unabated, will result in Labcorp losing customers and the goodwill that it recently purchased from BioReference.

## THE PARTIES

8.      Labcorp is a Delaware corporation with its principal place of business located at 531 South Spring Street, Burlington, North Carolina 27215.

9.      Upon information and belief, Defendant Brown is a South Carolina resident, who lives at 153 Sandshell Drive, Charleston, South Carolina 29492.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331 with respect to Labcorp's claims under the Defend Trade Secrets Act, 18 U.S.C. §

1836(c), and pursuant to 28 U.S.C. 1367 with respect to Labcorp's claims under state law.

11.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

12.    This Court has personal jurisdiction over Brown and venue is proper in this judicial district because the Agreement contains a forum selection clause that states:

> Disputes arising under this Key Employee Agreement may only be filed in the Superior Court for the State of New Jersey or the United States District Court for the District of New Jersey and such courts shall have jurisdiction over any and each of the parties. Each of the parties hereby consents to such exercise of jurisdiction.

### FACTUAL BASIS OF THE CLAIMS

### A.    BioReference's Business

13.    BioReference is headquartered in Elmwood Park, New Jersey. BioReference was previously known as BioReference Laboratories, Inc. and was incorporated in New Jersey. In March 2022, BioReference converted to BioReference Health LLC, a Delaware limited liability company, through a plan of conversion.

14.    BioReference offers scientific expertise and laboratory innovation in oncology, urology, and women's health. BioReference provides tailored solutions

for a wide spectrum of customers and patients, including small and large medical practices, hospitals and health systems, correctional institutions and government agencies. In addition to laboratory testing, BioReference offers large-scale health screening programs, on-demand mobile phlebotomy, and business solutions that optimize laboratory testing and management.

15.    BioReference markets and sells its laboratory testing products through a network of Sales Representatives, who are also referred to as "Account Executives." Each Account Executive serves and solicits BioReference clients and prospective clients located in an assigned geographic territory.

16.    BioReference retains and attempts to expand its book of business by developing and maintaining relationships with customers and prospective customers, developing products and sales strategies to address customers' specific needs, and employing pricing strategies to counteract those of its competitors. The market for laboratory testing is highly competitive and BioReference's relationships with its customers are vital to its success.

17.    To this end, BioReference devotes substantial resources to training its Account Executives on BioReference products and sales strategies. Among other things, Account Executives attend two forms of monthly training sessions, which include (1) monthly "Town Hall" meetings that are attended by all Account Executives across the organization, and (2) specific trainings that focus on

particular product lines or target customer bases that the Account Executive are responsible for serving. These monthly training sessions address an array of subject matters, including sales performance and growth strategies, innovations and updates in BioReference's product offerings, any newly available laboratory testing and improvements to existing products. The Town Hall meetings addressed BioReference's business nationwide and were not limited to any region.

18.    PowerPoint presentations are typically prepared and presented to Account Executives during these monthly trainings. The presentations are displayed over the videoconferencing platform and designated as "Proprietary and Confidential."

### B.    <u>Brown's Employment with BioReference</u>

19.    Brown began his employment as an Account Executive at BioReference effective September 10, 2012.

20.    As an Account Executive, Brown was responsible for selling women's health products in his assigned geographic territory, which included the states of South Carolina and North Carolina. No other BioReference employee was responsible for selling women's health products in Brown's territory. Brown was responsible for developing and maintaining relationships with customers and was thus the primary source of contact for the customers he served until his resignation.

21.    Brown was also responsible for developing relationships with prospective customers, many of which were sales leads that BioReference supplied to Brown. Account Executives, like Brown, are responsible for building relationships with employees at all levels at customers and prospective customers, including physicians, office managers, nurses, phlebotomists, and others, in order to learn and respond to their business needs. These relationships, which Brown developed and maintained while working on BioReference's time and in reliance on BioReference's resources, including its confidential information, would give Brown an advantage in selling products that compete with the BioReference business that Labcorp acquired.

22.    Brown routinely participated in meetings and trainings concerning the implementation of business plans and sales strategies where he was exposed to confidential and proprietary information regarding the marketing, sales, and pricing of BioReference products. None of the information presented at these meeting was publicly available or generally known in the industry.

23.    Brown had access to a myriad of confidential and proprietary information while working at BioReference, including BioReference's customer lists and purchasing data; technical services information; competitive product comparisons; research and development programs; customer marketing data and purchasing patterns; strategies for retaining existing customers; pricing formulae

and applicable discount codes; sales and distribution methods; and BioReference's targeted prospective customers and strategies for obtaining their business.

24.    All of the confidential and proprietary information that Brown had access to by virtue of his employment with BioReference, which is not generally known in the industry or to the public, was developed through great effort, is used by BioReference (and now Labcorp) to obtain a competitive advantage over competitors and would be extraordinarily valuable to a competitor of the BioReference business. BioReference (and now Labcorp) therefore took measures and implemented policies to keep this information confidential.

### C.    The Terms of the Key Employee Agreement

25.    In March 2020, BioReference made changes to its sales compensation structure. At that time, Sales Representatives were asked to sign a new Key Employment Agreement, which among other things, provided BioReference with protections against the unauthorized use or disclosure of BioReference's confidential information and imposes restrictions on employees capitalizing on BioReference's goodwill and customer relationships to compete against BioReference.

26.    Brown agreed to the terms of the Agreement on or about March 16, 2020. The Agreement contains a choice of law provision stating that the agreement shall be governed by the laws of the State of New Jersey. BioReference selected

New Jersey for the choice of law as to ensure a uniform nationwide interpretation and application of the Key Employment Agreement.

27.     Section 5.B. of the Agreement contains a restrictive covenant governing post-employment competition as follows:

> During Employee's employment and for a period of one (1) year following Employee's termination of employment from the Company, whether termination is voluntary or involuntary, and regardless of the reason(s) for such termination, Employee shall not, without the express written consent of the Company, directly or indirectly, by Employee or through any other person, firm, partnership, corporation, entity or enterprise own, manage, join, advise, render conflicting products or services to, engage or participate in, consult or work for, or otherwise do business with a competing business or Customer of Company, in any county of any state in which Employee provided services for Company during the tenure of their employment…

28.     Section 5.A.(1) of the Agreement contains a restrictive covenant governing post-employment solicitation of BioReference customers or prospective customers as follows:

> [D]uring Employee's employment and for a period of one (1) year following the termination of Employee's employment with the Company, whether termination is voluntary or involuntary, and regardless of the reason for the termination, Employee shall not, without the express written consent of Company, directly or indirectly, by Employee or through any other person, firm, partnership, corporation, entity or enterprise… Solicit, contact, or

accept business and/or make or derive any sales from any customer or prospective customer of the Company, or solicit, encourage, or induce any Customer or prospective customer of the Company to reduce, stop or avoid doing business with the Company or its Affiliates. If Employee is contacted by any Customer or prospective Customer of the Company, Employee will notify the Customer or prospective Customer of this restriction and will refrain from engaging in any type of business activity as required herein.

29.    In addition, Section 5.A.(2) of the Agreement restricts Brown from soliciting BioReference employees as follows:

[D]uring Employee's employment and for a period of one (1) year following the termination of Employee's employment with the Company, whether termination is voluntary or involuntary, and regardless of the reason for the termination, Employee shall not, without the express written consent of Company, directly or indirectly, by Employee or through any other person, firm, partnership, corporation, entity or enterprise… Interfere with the Company's or its Affiliates' business and employment relationships with their respective employees and contractors by soliciting, inducing, or encouraging any such persons to terminate an existing business or employment relationship with the Company or its Affiliates, or otherwise assist or encourage any person or entity, including Employee's new employer, to hire an employee away from the Company or its Affiliates. If Employee is contacted by any other employee of the Company or its Affiliates, Employee will notify the employee of this restriction and will refrain from hiring or assisting said employee to terminate his or her

10

employment relationship with the Company or its Affiliates.

30.    Brown also acknowledged that, through his position with BioReference, he would become knowledgeable of BioReference's confidential and trade secret information that was not generally known in the trade or industry. Section 5 of the Agreement reads, in relevant part:

> Employee recognizes and acknowledges that the Company is engaged in a highly competitive business and further recognizes and acknowledges that Confidential Information, and relationships with Company's actual customers and prospective customers, which Employee will become knowledgeable of as an employee of Company, are valuable, special, and unique aspects of Company's business, which have been created and developed at great time, effort and expense to the Company.

31.    In addition, the Agreement requires that Brown not disclose or use any Confidential Information (as defined by the Agreement). Section 5.C. of the Agreement states:

> Accordingly, during Employee's employment and for an ***unlimited period*** following the termination of employee's employment with the company, whether termination is voluntary or involuntary, and regardless of the reason(s) for such termination, Employee shall not, without the express written consent of Company, directly or indirectly, by Employee or through any other person, firm, partnership, corporation, entity or enterprise, disclose or use, in any manner, or allow to be disclosed or used in any manner, "Confidential Information."

32.    Confidential    Information    includes    information    concerning BioReference's "past, present, or prospective customers, vendors, suppliers and distributors, such as, but not limited to, customer identities and customer lists; marketing, merchandising or servicing techniques, methodologies and procedures; manuals;    agreements;    reports;    notes;    price    schedules;    memorandum    and correspondence; product lists; financial records; computer programs, systems or modes; contracts and the content of negotiations culminating in such contracts, including any records thereof."

33.    The Agreement specifically states that the "Company considers all Confidential Information to be trade secrets protected under the federal Defend Trade Secrets Act, the New Jersey Uniform Trade Secrets Act, the South Carolina Uniform Trade Secrets Act and the common law."

34.    Moreover, pursuant to Section 5.C. of the Agreement, Brown is obliged to return all Confidential Information upon termination of employment:

> All Confidential Information shall remain the exclusive property of the company and its Affiliates unless otherwise agreed by both parties in writing. All writings, records, and other documents and things comprising, containing, describing, discussing, explaining, or evidencing any Confidential Information and the like in Employee's custody or possession that have been obtained or prepared in the course of Employee's employment with the Company or its Affiliates shall be the exclusive property of the Company and its Affiliates, and shall be returned by Employee to the company an/or

its Affiliates, without Employee retaining any copies, upon notification of the termination of Employee's employment, or at any other time requested by the Company.

**D.    Brown Terminates his Employment with BioReference And Begins Working for Arbor In Violation of the Agreement**

35.    On or about July 26, 2024, Brown informed BioReference that he was voluntarily resigning from BioReference. Brown subsequently submitted his resignation in writing with an effective date of August 2, 2024.

36.    Brown did not disclose to BioReference that he was going to work for a competitor at the time of his resignation. In fact, at the time of his resignation, Brown indicated that he had no intention of continuing to work in the industry and would not be competing with BioReference.

37.    Before terminating his employment with BioReference, Brown sent confidential, proprietary and/or trade secret information from his BioReference email account to his personal email account without authorization from BioReference.

38.    The confidential and proprietary Brown took includes, among other things, clients lists, pricing, and billing worksheets containing Protected Health Information (PHI) of patients. Brown also took images of a presentation regarding his sales performance that was stamped "Proprietary and Confidential."

39.    After resigning from BioReference, Brown began to work for Arbor.

40.    Brown visited Grand Dunes ObGyn & Facial Aesthetics ("Grand Dunes") in Myrtle Beach, South Carolina, on or about August 21, 2024, and left sales materials indicating that he was employed by Arbor.

41.    Grand Dunes was a BioReference customer within the territory that Brown serviced during his employment with BioReference.

42.    Arbor directly competes with the BioReference business that Labcorp recently acquired in the area of laboratory testing and diagnostic services.

43.    After learning that Brown was competing with BioReference on behalf of Arbor, BioReference began to investigate Brown's conduct prior to his resignation. BioReference discovered that Brown had emailed BioReference's proprietary, confidential and/or trade secret information from his BioReference email account to his personal email account between February 2024 and July 30, 2024.

44.    Upon information and belief, Brown took the proprietary, confidential and/or trade secret information relating to the BioReference business for the purpose of using it to compete against Labcorp to Arbor's benefit.

**E.    BioReference Sends Letters to Brown and Arbor Outlining Brown's Obligations Under the Agreement**

45.    On August 29, 2024, BioReference's counsel sent letters to Brown and to Arbor's General Counsel, enclosing a copy of the Agreement, and outlining Brown's obligations under the Agreement, including the obligation not to compete

against, or to solicit the customers of BioReference for a period of one year following his termination and his obligations not to use or disclose the confidential and proprietary information relating to the BioReference business.

46.     BioReference's August 29 letter demanded that Brown return all hard copies of any BioReference files and delete any electronic copies of any and all of BioReference's confidential and proprietary information and/or any patient information in his possession.

47.     BioReference also sent Brown a Certification of Destruction of Company Records to, among other things, affirm that he had destroyed any confidential or proprietary information he had taken as well as that he would comply with all provisions of the Agreement.

48.     On September 9, 2024, Arbor responded to the letter through legal counsel, claiming that Brown did not have any confidential information and would comply with Arbor's instruction.

49.     Arbor stated that it would instruct Brown to "not solicit BioReference's clients or prospective clients for the next 30 days," far short of the one-year requirement stated in the Agreement.

50.     Upon information and belief, Brown subsequently executed a modified version of the Certification indicating that, to the best of his knowledge, he did not retain or disclose any of Confidential Information.

**F.**     **BioReference Assigned its Rights under the Agreement to Labcorp**

51.     On March 27, 2024, BioReference, Opko Health, Inc., and Labcorp entered into an Asset Purchase Agreement ("APA"), pursuant to which Labcorp agreed to purchase the right, title, and interest in assets related to BioReference's clinical and anatomic pathology laboratory testing and reproductive and women's health business that offers certain laboratory testing services to customers within the Business Territory, including those marketed as "BioReference" ("Purchased Assets").

52.     The Purchased Assets include, among other things, "Assigned Contracts," which is defined to include the Agreement at issue here.

53.     The Purchased Assets also include (i) "all claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind against third parties relating to the Business or the Purchased Assets;" (ii) the "benefit of and all rights to enforce any covenants, warranties, representations or guarantees under the Assigned Contracts;" (iii) the laboratory-related IT Assets used in the operation of the Business as of the Closing Date;" (iv) "the goodwill, going concern value and other intangible assets associated with the assets;" (v) "all other assets, whether tangible or intangible, primarily used in the Business and not included in the Excluded Assets;" and (vi) "all customer accounts of the Business Customers, copies or originals of any and all past and pending documents of sale and service

information and data, Business Customer and vendor lists, pricing and cost information, billing records, sales and promotional literature, payor lists, inventory cost records, quality control records and procedures, machinery and equipment records, mailing lists, purchase orders, [and] Business Customer files and records."

54. The transaction contemplated under the APA closed on September 16, 2024.

### G.    **Irreparable Harm to Labcorp**

55. Unless enjoined, Brown will continue to breach the Agreement and his legal duties and obligations by working for Arbor, disclosing BioReference's proprietary, confidential and/or trade secret information, and misusing BioReference's proprietary, confidential and/or trade secret information to Arbor's advantage and to the competitive disadvantage of the BioReference business that Labcorp acquired.

56. Due to Brown's disclosure and/or inevitable disclosure of proprietary, confidential and/or trade secret information as well as the actual and potential loss of goodwill, Labcorp is entitled to a temporary restraining order as well as preliminary and permanent injunctive relief barring Brown from violating the non-competition, non-disclosure, and non-solicitation obligations in the Agreement, the federal Defend Trade Secrets Act and the New Jersey Trade Secrets Act. Labcorp

is also entitled to damages, including lost profits, interests, costs, and attorneys' fees.

## COUNT I
## <u>BREACH OF CONTRACT</u>

57.    Labcorp hereby repeats and incorporates by reference as if fully set forth herein the allegations contained in the preceding Paragraphs.

58.    Brown knowingly and voluntarily entered into the Agreement with BioReference.

59.    The promises made by Brown were material terms to the Agreement, which was executed by Brown in exchange for his continued employment as a Sales Representative with BioReference in March 2020 and in connection with BioReference's adoption of a new sales compensation structure.

60.    The Agreement is supported by adequate consideration.

61.    The Agreement is valid, binding, and enforceable.

62.    Upon information and belief, BioReference fully performed as required under the Agreement.

63.    Brown breached the Agreement by engaging in the conduct described herein, including (1) emailing himself proprietary, confidential and/or trade secret information, (2) failing to return BioReference Confidential Information following his resignation, (3) working for a competing company within one year of his employment with BioReference in the same counties that he serviced for

18

BioReference, and (4) soliciting BioReference customers and/or prospective customers.

64.    BioReference validly assigned its rights under the Agreement to Labcorp.

65.    Brown's breaches have resulted in damages to Labcorp in an amount to be determined at trial but which, upon information and belief, exceed $75,000. Additionally, under the Agreement, Brown is required to pay Labcorp all of LabCorp's costs and expenses incurred enforcing the terms of the Agreement, including its attorneys' fees.

66.    As a further result of Brown's breaches, LabCorp has suffered and will suffer damages and irreparable harm, including, but not limited to, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law.

## COUNT II
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1832, *et. seq.*

67.    Labcorp hereby repeats and incorporates by reference as if fully set forth herein the allegations contained in the preceding Paragraphs.

68.    The Defend Trade Secrets Act (the "DTSA") defines "trade secret" to include all forms and types of financial, business or economic information—including plans, compilations, methods, techniques, processes, procedures or

programs if (a) the owner of the information has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known or readily ascertainable through independent development by persons who can obtain economic value from its disclosure or use. See 18 U.S.C. § 1839(3).

69.     Brown obtained BioReference's trade secrets by improper means and without authorization. Brown emailed materials containing trade secret information to his personal email in the months leading up to his resignation.

70.     Brown's nefarious intent in conspiring to take these files is evidenced by, among other things, Brown's theft of the documents containing trade secret information in the months leading up to his resignation, including after Brown informed BioReference that he was resigning from his employment with BioReference; and Brown's false assurance to BioReference that he was no longer going to work in the laboratory testing service industry post resignation.

71.     Brown knew or should have known that files he sent to his personal email account prior to his resignation contained trade secrets. Among other reasons, the Agreement acknowledges that the information contained in the files constitutes trade secret information and some of the information Brown took was conspicuously designated as "Proprietary and Confidential."

72.    Brown acknowledged that by virtue of his employment with BioReference, he would become knowledgeable of confidential and trade secret information not generally known in the trade or industry, or readily ascertainable to competitors, including but not limited to information concerning "past, present, or prospective customers, vendors, suppliers and distributors, such as, but not limited to, customer identities and customer lists; marketing, merchandising or servicing techniques, methodologies and procedures; manuals; agreements; reports; notes; price schedules; memorandum and correspondence; product lists; financial records; computer programs, systems or modes; contracts and the content of negotiations culminating in such contracts, including any records thereof."

73.    Additionally, the Agreement specifically states that Brown acknowledged that such confidential information is "useful, valuable and unique assets of the Company and its Affiliates, and will be treated as trade secrets under the Defend Trade Secrets Act the New Jersey Uniform Trade Secrets Act, and the common law."

74.    BioReference made a substantial effort to protect the secrecy of the confidential information that Brown misappropriated. Indeed, it was only by violating his contractual obligations to BioReference that Brown was able to retain and use the information.

75.    This confidential information confers an economic advantage to Labcorp over its competitors, and such information would be extremely valuable to a competitor, such as Arbor.

76.    Upon information and belief, Brown has used or intends to use the unlawfully obtained trade secret information regarding the BioReference business in his efforts to solicit customers and prospects on behalf of Arbor, a direct competitor of BioReference.

77.    Brown's theft and unauthorized use of BioReference's trade secrets, which were obtained by Brown through improper means, constitute misappropriation of trade secrets in violation of the DTSA.

78.    As a result of this breach, Labcorp has suffered and will suffer damages and irreparable harm, including, but not limited to, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law, in an amount exceeding $75,000.

79.    Because Brown's misconduct poses a threat of significant irreparable harm that cannot be compensated by money alone, BioReference is entitled to injunctive relief against Brown from actual or threatened disclosure or use of BioReference's trade secrets.

**COUNT III**
**VIOLATION OF THE NEW JERSEY TRADE**
**SECRETS ACT N.J. Stat. Ann § 56:15.**

80.    Labcorp hereby repeats and incorporates by reference as if fully set forth herein the allegations contained in the preceding Paragraphs.

81.    The New Jersey Trade Secrets Act ("NJTSA") defines "trade secret" to include **"**information, held by one or more people, without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.J. Stat. Ann. § 56:15-2.

82.    The files that Brown sent to his personal email in the months leading up to his resignation contain trade secrets under the NJTSA.

83.    Brown knew or should have known that emailed files contained trade secrets.

84.    Brown acknowledged that by virtue of his employment with BioReference, he would become knowledgeable of confidential and trade secret information not generally known in the trade or industry, or readily ascertainable to

23

competitors, including but not limited to information concerning "past, present, or prospective customers, vendors, suppliers and distributors, such as, but not limited to, customer identities and customer lists; marketing, merchandising or servicing techniques, methodologies and procedures; manuals; agreements; reports; notes; price schedules; memorandum and correspondence; product lists; financial records; computer programs, systems or modes; contracts and the content of negotiations culminating in such contracts, including any records thereof."

85.    Additionally, the Agreement specifically states that Brown acknowledged that such confidential information is "useful, valuable and unique assets of the Company and its Affiliates, and will be treated as trade secrets under the Defend Trade Secrets Act the New Jersey Uniform Trade Secrets Act, and the common law."

86.    Brown acquired trade secret information relating to the BioReference business without express and implied authority from BioReference.

87.    Brown's actions, as set forth herein, constitute "misappropriation" within the meaning of the NJTSA. *See* N.J. Stat. Ann. § 56:15-2.

88.    Brown has been or will be unjustly enriched by the misappropriation of LabCorp's trade secrets. Unless restrained, Brown will continue to use or disclose, or actually use or disclose, LabCorp's trade secrets.

89.    As a result of Brown's misappropriation of its trade secrets, LabCorp has already been injured and faces further irreparable injury.

90.    Brown's actions in misappropriating trade secrets relating to the BioReference business were done in bad faith, to injure and oppress BioReference and/or Labcorp and improve Brown's own economic opportunities.

## **PRAYER FOR RELIEF**

WHEREFORE, Labcorp prays for judgment in Labcorp's favor on all counts against Brown as follows:

1.    For a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Brown, including his agents, servants, employees, attorneys, and those persons in active concert or participation with them, from the following:

a.    engaging or participating in, consulting, working for, or otherwise doing business on behalf of a competing business of the BioReference business that Labcorp acquired in any county or any state in which Brown provided services for BioReference during the tenure of his employment with BioReference;

b.    soliciting or otherwise interfering with the business of any customers or prospective customers of the BioReference business that Labcorp acquired;

c.    obtaining, accessing, using, possessing, retaining, transmitting, copying, or disclosing any BioReference confidential, proprietary, or trade secret information, including but not limited to financial, marketing, and business information, and specifically the BioReference documents that Brown emailed to himself in the months leading up to his resignation from BioReference;

d.    deleting, destroying, altering, or erasing any evidence relating to this action, including but not limited to any hard or electronic copies of any BioReference confidential, proprietary, or trade secret information Brown copied, accessed, or took from BioReference, or any computers, data storage devices, or accounts used to access or retain such information.

2.    For an Order that, within two (2) business days of the issuance of the Order, Brown shall:

a.    return to Labcorp all information, documents, and tangible things in his possession, custody, or control, whether in

physical or digital format, including any and all copies thereof, that contain BioReference confidential, proprietary, or trade secret information, including specifically the files Brown emailed to himself in the months leading up to his resignation, which shall be subjected to a forensic inspection by an independent third party vendor to be engaged by counsel for Labcorp;

b.    identify and provide access to an independent third-party vendor all data storage devices, data storage accounts, email accounts, local drives, shared drives, phones, tablets, or other computer systems from which Brown accessed or used BioReference proprietary, confidential and/or trade secret information, so that the vendor may catalog any such information and otherwise preserve evidence for this litigation and remove any such BioReference information from Brown's possession;

3.    For an Order that Brown shall immediately (a) identify any person or entity to whom Brown disclosed or provided any copy of all or any part of BioReference proprietary, confidential and/or trade secret information; and (b) put them on notice not to use and to return to Labcorp any such information;

27

4.    For an Order showing an accounting of monies obtained through Brown's wrongful acts;

5.    For an Order of disgorgement of any monies obtained through wrongful acts;

6.    For lost profits of Labcorp as a result of Brown's wrongful acts;

7.    For compensatory damages in an amount to be shown at trial;

8.    For exemplary damages of twice the amount awarded as general damages for Count II for misappropriation of trade secrets;

9.    For Labcorp's actual costs, expenses, and reasonable attorney's fees, including all related costs and expenses, incurred by Labcorp in connection with this action;

10.    For pre- and post- judgment interest;

11.    For any other and further relief as provided for by contract, statute, or law, or that this Court deems just and proper.

Dated: October 1, 2024
    New York, New York

Respectfully submitted,
KELLEY DRYE & WARREN LLP



Robert I. Steiner
Levi M. Downing
One Jefferson Road, 2nd Floor
Parsippany, NJ 07054
Telephone: (973) 503-5900
rsteiner@kelleydrye.com
ldowning@kelleydrye.com

*Attorneys for Plaintiff Laboratory Corporation of America Holdings*